IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

KURTIS L. BROWN,                                         CV. 05-1520 AA

               Plaintiff,                          OPINION AND ORDER

          v.

JOANNE B. BARNHART
Commissioner of Social Security,

               Defendant.

AIKEN, Judge:

    Plaintiff  Kurtis Brown brings this action pursuant to the Social Security Act, 42 U.S.C.

§ 405(g), to obtain judicial review of a final decision of the Commissioner of the Social Security

Administration ("Commissioner") denying his claim for Disability Insurance Benefits.  For the

reasons set forth below, the decision of the Commissioner is affirmed.

## PROCEDURAL BACKGROUND

    Plaintiff filed an application for benefits on January 29, 2004 alleging disability since

December 30, 2003, due to back and neck pain and depression.  His application was denied initially
and upon reconsideration.  On November 30, 2004,  a hearing was held before an Administrative
Law Judge ("ALJ").  In a decision dated March 15, 2005, the ALJ found plaintiff was not entitled
to benefits.  On September 23, 2005, the Appeals Council denied plaintiff's request for review,
making the ALJ's decision the final decision of the Commissioner. Plaintiff now seeks judicial
review of the Commissioner's decision.

## STANDARDS

A claimant is disabled if he or she is unable "to engage in any substantial gainful activity by
reason of any medically determinable physical or mental impairment which . . . has lasted or can be
expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The
initial burden of proof rests upon the claimant to establish his or her disability.  *Roberts v. Shalala*,
66 F.3d 179, 182 (9th Cir. 1995), *cert. denied*, 517 U.S. 1122 (1996).  The Commissioner bears the
burden of developing the record.  *DeLorme v. Sullivan*, 924 F.2d 841, 849 (9th Cir. 1991).

The district court must affirm the Commissioner's decision if it is based on proper legal
standards and the findings are supported by substantial evidence in the record as a whole.  42 U.S.C.
§ 405(g); *see also Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995).  "Substantial evidence
means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a
reasonable mind might accept as adequate to support a conclusion."  *Andrews*, 53 F.3d at 1039.  The
court must weigh all of the evidence, whether it supports or detracts from the Commissioner's
decision.  *Martinez v. Heckler*, 807 F.2d 771, 772 (9th Cir. 1986).  The Commissioner's decision
must be upheld, however,  if "the evidence is susceptible to more than one rational interpretation."
*Andrews*, 53 F.3d at 1039-40.

2  - OPINION AND ORDER

## DISABILITY ANALYSIS

The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act.  20 C.F.R. §§ 404.1520, 416.920; *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999).  At steps one through four, the burden of proof is on the claimant.  *Tackett*, 180 F.3d at 1098.  At step five, the burden shifts to the Commissioner to show that the claimant can perform jobs that exist in significant numbers in the national economy.  *Id.*

At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since the alleged onset of disability on December 30, 2003.  20 C.F.R. §§ 404.1520(b), 416.920(b).

At step two, the ALJ found that plaintiff had the medically determinable severe impairments of degenerative disc disease of the cervical spine, a possible meniscus tear of the left knee, and a depressive disorder or adjustment disorder.  20 C.F.R. §§ 404.1520(c), 416.920(c).

At step three, the ALJ found that plaintiff's impairments did not "meets or equal" one of the impairments listed in the Social Security Administration ("SSA") regulations, 20 C.F.R. Part 404, Subpart P, Appendix 1.  20 C.F.R. §§ 404.1520(d), 416.920(d).

At step four, the ALJ determined that plaintiff retained the residual functional capacity ("RFC") to perform a reduced range of light exertional level work, with crouching, crawling, stooping, kneeling and climbing limited to an occasional basis, and that plaintiff must avoid exposure to hazards.  The ALJ also determined that plaintiff was limited to simple, repetitive tasks and instructions but was capable of working in a competitive work setting with normal expectations for productivity, breaks, and absenteeism.  Based on this RFC assessment, the ALJ found that plaintiff was unable to return to his past work as a roofer. 20 C.F.R. §§ 404.1520(e), 416.920(e).

At step five, the ALJ determined that plaintiff retained the ability to perform work as a

3  - OPINION AND ORDER

surveillance system monitor, microfilm preparer, cashier, and locker room attendant. As a result, the ALJ found plaintiff not disabled within the meaning of the Act. 20 C.F.R. §§ 404.1520(f)(1), 416.920(f)(1).

## FACTUAL BACKGROUND

Plaintiff was born in 1957, and was 47 years old at the time of the hearing decision. Tr. 26. He has a high school education, and has worked as a roofer, green chain puller, log truck driver, and fork lift operator. Tr. 118.

The medical records in this case accurately set out plaintiff's medical history as it relates to his claim for benefits. The court has carefully reviewed the extensive medical record, and the parties are familiar with it. Accordingly, the details of those medical records will be set out below only as they are relevant to the issues before the court.

## DISCUSSION

Plaintiff contends that the ALJ erred by: (1) finding him not fully credible; (2) failing properly to consider lay witness testimony; (3) improperly rejecting the opinion of the treating physician; and (4) improperly rejecting the opinion of an examining psychiatrist.

I. Plaintiff's Credibility

Plaintiff testified that he naps in the afternoon because of pain. Tr. 56. His doctor has advised him to attempt to regulate his sleep schedule as plaintiff will go to bed at 7:00 or 8:00 at night, and get up at 1:30 in the morning and remain awake until early afternoon. This occurs about three times a month.

Plaintiff testified that he has muscle spasms in his neck and back. Tr. 56. He understands that "the discs are gone," and it is "bone-on-bone." Tr. 57. He has not been referred to a

neurosurgeon. Plaintiff stated that he cannot work because his back and neck "are constantly spasming" and he is in constant "hot burning" pain. Tr. 58. He works in his wife's office, filing, sometimes, and works an hour to an hour and a half before he has to lie on the floor for an hour or two until the spasms cease. Tr. 59. He takes six to eight oxycontin a day for pain. Plaintiff testified that it takes two to three hours, after he takes his medication, for him to be able to function in the morning. Tr. 60. He fills water buckets for his miniature horses. Tr. 61. He is irritable. Tr. 62.

Plaintiff points to unsworn statements in which he asserts that he has pain in his upper back, both knees, and his hernia. Tr. 165. The pain continues whether he is sitting, standing, or laying down. In his February 2004 Activities of Daily Living and Socialization form, plaintiff states that he takes nine oxycontin pills each day. Tr. 166.

In a second February 2004 unsworn statement, plaintiff asserts that he has good days and bad days, and that on bad days he has no energy and cannot bathe, dress, do house work, prepare meals or eat. Tr. 168. He states that he "will often sit on the front porch and stare for hours on end." *Id*. Plaintiff says that he experiences severe depressive episodes two or three times per month, and they last one to two days.

The ALJ found plaintiff's allegations not credible, because they were "disproportionate to the objective findings in the medical record which note only mild degenerative changes to the spine and only a questionable small ligament tear in the knee." Tr. 30. Additionally, the ALJ noted that plaintiff's reported activities were "more consistent with those of an individual able to sustain light work than they are of an incapacitated person's." Tr. 30. Specifically, the ALJ noted plaintiff's testimony that he hoses down the yard of his house, waters his five miniature horses, occasionally loads the dishwasher and starts laundry, and drives. Tr. 30. The ALJ further found that plaintiff's

5  - OPINION AND ORDER

medication and dosages were "not indicative of a total disability" and that plaintiff "was working for many years with his knee problem and for many years with his back problem, and actually stopped working when he developed an acute hernia." Tr. 31. The ALJ noted that plaintiff made no effort to return to work or obtain vocational rehabilitation after repair of that hernia. Tr. 31. Thus, the ALJ found that plaintiff's alleged impairments and their impact on his ability to work "are accepted only to the extent that they are consistent with the residual functional capacity assessment arrived at below." Tr. 31.

The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities. *Andrews v. Shalala,* 53 F.3d 1035, 1039 (9th Cir. 1995). However, the ALJ's findings must be supported by specific, cogent reasons. *Reddick v. Chater,* 157 F.3d 715, 722 (9th Cir. 1998). Unless there is affirmative evidence showing that the claimant is malingering, the Commissioner's reason for rejecting the claimant's testimony must be "clear and convincing." *Id.* The ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints, and the evidence upon which the ALJ relies must be substantial. Id. at 722, 724; *see also Holohan v. Massinari,* 246 F.3d 1195, 1208 (9th Cir. 2001). General findings (e.g., "record in general" indicates improvement) are an insufficient basis to support an adverse credibility determination. *Reddick,* 157 F.3d at 722; *see also Holohan,* 246 F.3d at 1208. The ALJ must make a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony. *Thomas v. Barnhart,* 278 F.3d 947, 958 (9th Cir. 2002).

In deciding whether to accept a claimant's subjective symptom testimony, "an ALJ must perform two stages of analysis: the *Cotton* analysis and an analysis of the credibility of the

claimant's testimony regarding the severity of her symptoms." *Smolen v. Chater,* 80 F.3d 1273, 1281

(9th Cir. 1996) (footnote omitted).

> Under the *Cotton* test, a claimant who alleges disability based on subjective
> symptoms "must produce objective medical evidence of an underlying impairment
> which could reasonably be expected to produce the pain or other symptoms alleged.
> . . ." *Bunnell,* 947 F.2d at 344 (quoting 42 U.S.C. § 423(d)(5)(A)(1988)); *Cotton,* 799
> F.2d at 1407-08.  The *Cotton* test imposes only two requirements on the claimant:
> (l) she must produce objective medical evidence of an impairment or impairments;
> and (2) she must show that the impairment or combination of impairments *could
> reasonably be expected to* (not that it did in fact) produce some degree of symptom.

*Smolen*, 80 F.3d at 1282 (italics in original).

There is objective medical evidence that plaintiff suffers from depression, a bulging disc in

his neck, and a possibly torn meniscus. These impairments could reasonably be expected to cause

some pain and impaired concentration.  Therefore, the ALJ may not simply reject plaintiff's

symptom testimony.  *Id.*  To determine whether plaintiff's testimony is credible the ALJ may

consider, for example:  (l) ordinary techniques of credibility evaluation, such as a reputation for lying

or prior inconsistent statements; (2) unexplained or inadequately explained failure to seek treatment

or to follow a prescribed course of treatment; and (3) the claimant's daily activities.  *Smolen,* 80 F.3d

at 1284.

The ALJ correctly noted that plaintiff describes his spinal impairment as much more severe

than is shown by objective medical testing.  He also correctly recognized that plaintiff continued to

work as a self-employed roofer with his knee and back problems up until he was unable to continue

due to a hernia.

The ALJ found that plaintiff's assertion that he is unable to perform work was inconsistent

with the medical record.  The ALJ noted that a February 2004 MRI of plaintiff's thoracic spine was

negative.  Tr. 27, 318.  A May 2004 MRI of the cervical spine indicated some mild degenerative changes with no evidence of foraminal encroachment, spinal stenosis, or extruded disc fragments. Tr. 27, 252.  X-rays of the cervical spine taken in April 2004 indicated normal alignment with only some degenerative disc disease and mild encroachment at C5-C6 and C6-C7.  Tr. 27, 253.

X-rays of plaintiff's left knee were taken in January 2000 and November 2002.  Tr. 363-64. These x-rays were interpreted as normal.  A September 2002 MRI of plaintiff's left knee was interpreted to show that the lateral meniscus appeared to be intact, but due to high signal changes there was a "question" of a posterior horn flap tear.  Tr. 27, 390.  Plaintiff underwent surgical repair of his left groin hernia in June 2004 without complications.  Tr. 300-02.  The ALJ correctly noted that plaintiff's allegations of disability are disproportionate to the objective findings in the medical record which demonstrate only mild degenerative changes to the cervical spine and a potential small ligament tear in the knee.  Tr. 30.

The ALJ also correctly noted that plaintiff underwent a psychological evaluation by Charlotte Higgins-Lee, Ph.D., in April 2004.  Tr. 28, 237-41.  After interviewing and testing plaintiff, Dr. Higgins-Lee concluded that he did not meet the criteria for a diagnosis of major depression.  Tr. 28, 240.  She did state "[S]ince he reported considerable knee and back pain but there were no observed pain behaviors it may be that he exaggerates his problems.  It is my opinion that a person with back and knee pain would not be able to smoothly bend down and recline on the floor.  He was also able to quickly and smoothly rise from the floor when the interview was over."  Tr. 240.  Dr. Higgins-Lee concluded that it was necessary to rule out hypochondriasis.  *Id.*

The record also contains the report of Peter Verhey, M.D., who examined plaintiff on May 1, 2004, and examined his medical records.  Tr. 232-36.  Dr. Verhey recorded plaintiff's assertion

8  - OPINION AND ORDER

that the pain was constant and an eight or nine out of ten in severity.  Plaintiff told Verhey he was

unable to work because he "cannot stand for more than a few minutes as his back is extremely

painful and he has to be moving constantly as he is fidgety."  Tr. 233.  Dr. Verhey stated that

"[D]uring the examination the claimant continued to flinch with examination movements and at one

point jokingly threatened myself in terms of his moving his examination and palpating tender spots.

I believe a lot of these reactions were gandered by the claimant to enhance the level of suspicion of

his pain."  *Id*  Dr. Verhey concluded that plaintiff had a reduced range of motion, muscle spasm, and

proximal weakness, and that he could stand or walk six to eight hours in a workday.  Dr. Verhey

opined that plaintiff could lift 20 pounds occasionally, ten pounds frequently, and had some

limitations on bending, stooping, crouching, or working on his knees.  Tr. 236.

Jacqueline A. Amato, M.D., a psychiatrist, examined plaintiff in July 2004.  Tr. 284-87.

Plaintiff reported that his "biggest problem today is the depression and lack of energy."  Tr. 284.

Plaintiff told Amato that he had chronic back pain because of three discs in the back that are "bone

on bone."  Tr. 285.  Plaintiff stated that he "enjoys buying old travel trailers and fixing them up.  He

also enjoys raising miniature horses."  *Id*  Dr. Amato described plaintiff as "somewhat cooperative,"

and diagnosed a major depressive disorder, single episode, adjustment disorder with mixed

disturbance of emotion, and rule out attention deficit disorder. She assessed a current Global

Assessment of Functioning ("GAF")[1] of 50, with plaintiff's highest GAF in the last year at 60.  Dr.

---

[1] The Global Assessment of Functioning (GAF) Scale is a tool for "reporting the clinician's judgment of the individual's overall level of functioning."  American Psychiatric Ass'n., Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 2000).  It is essentially a scale of zero to 100 in which the clinician considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," not including impairments in functioning due to physical or environmental limitations.  *Id.* at 34.

Amato recommended that plaintiff discontinue Lexapro and begin taking Effexor and Ritalin, and that he swim daily.  Tr. 287.

Accordingly, the ALJ made specific findings to support his conclusion that Plaintiff's allegation of disability was not credible, and as explained above, these findings are supported by substantial evidence in the record.

II.  Lay Witness Testimony

Catherine Brown has been married to plaintiff since 1989.  She testified that plaintiff works in her real estate office by filing papers and answering the phone, but he can only work for an hour to two before he has spasms in his back and has to lie on the floor.  Tr. 69.  After he lies on the floor he does not return to work.

Mrs. Brown testified that she massages her husband's back when he has spasms, and that the muscles in his upper shoulders and neck are tense and twitch.  Tr. 70.  When plaintiff gets up in the morning, it takes a few hours before he begins to function.  Tr. 71.  He helps around the house by using the dishwasher and doing laundry.  Tr. 72.  Plaintiff gets confused about his medication and Mrs. Brown puts his pills into marked containers for him.  He takes six to eight MS Contin per day for pain.  He experiences loss of memory, poor concentration, and fatigue, which Mrs. Brown attributes to the medication.  Tr. 73.  The dosage of medication has increased over time.  Tr. 74.

Plaintiff also cites as lay witness testimony Mrs. Brown's February 2004 sworn assertions in a Function Report form.  Tr. 149-57.  In this form, Mrs. Brown states that sometimes she has to help her husband take off his shoes.  Tr. 150.  She asserts that plaintiff does not prepare meals because of depression.  Tr. 151.  Mrs. Brown states that plaintiff has about a half-hour attention span, and that he does not answer the telephone because he does not like to deal with people.  Tr. 154-55.

The ALJ noted Mrs. Brown's testimony, stating, "The witness's testimony is accepted as descriptive of the witness's perceptions, but it does not provide sufficient support to alter the residual functional capacity arrived at herein."  Tr. 31.

The ALJ must consider lay witness testimony unless he or she expressly determines to disregard such testimony and gives reasons germane to each witness for doing so.  *Nguyen v. Chater,* 100 F.3d 1462, 1467 (9th Cir. 1996) (citing *Dodrill v. Shalala,* 12 F.3d 915, 918-19 (9th Cir. 1993)).  One reason for which an ALJ may discount lay testimony is that it conflicts with medical evidence.  *Vincent v. Heckler,* 739 F.2d 1393, 1395 (9th Cir. 1984).  The ALJ's decision in this case met these standards.

The ALJ had substantial evidence to support his determination that plaintiff was not fully credible regarding his limitations.  The ALJ accepted that Mrs. Brown accurately reported what she observed.  However, the behavior Mrs. Brown observed is not consistent with the medical and other evidence of record.  The ALJ considered the lay testimony and accepted it at face value and accorded it little weight.  This determination is supported by substantial evidence.

III.  Opinion of the Treating Physician

Plaintiff points to the forms prepared by his counsel and  completed by his treating physician, William Nelson, M.D.  Tr. 393-94; 399-405.   On November 30, 2004, Dr. Nelson checked a box indicating that he concurred with Dr. Amato's psychiatric assessment of November 29, 2004.  Tr. 393.   In that November 29, 2004 form, also prepared by plaintiff's counsel, Dr. Amato was asked whether, in her opinion, plaintiff's depression would prevent him from attending work or completing a normal eight hour workday.  Tr. 391.  The form allowed Dr. Amato to check boxes indicating "yes," "no," "insufficient information," or "unknown."  Dr. Amato checked "unknown."  *Id.*

Similarly, Dr. Amato checked "unknown" in response to whether such limitations would occur once per month or more often than one day per month.

In direct contradiction, Dr. Nelson checked a box indicating that plaintiff's depression would cause him to miss at least one day a month from work. Tr. 394. Dr. Nelson cannot both agree with Dr. Amato that it was unknown whether Plaintiff would miss work due to depression and assert that plaintiff would miss at least one day per month. Dr. Nelson checked "yes" to the question whether plaintiff would miss at least three or more days per month of work at a sedentary, unskilled, repetitive job due to neck and upper back pain and spasm. Tr. 394.

Dr. Nelson completed another form prepared by plaintiff's counsel, entitled Physical Residual Functional Capacity Questionnaire, on May 6, 2004. Tr. 399-405. In this form, Dr. Nelson endorsed a diagnosis of severe upper back pain, depression, internal derangement of left knee, and chronic pain. Tr. 399. Dr. Nelson affirmed counsel's lengthy descriptions of plaintiff's asserted limitations. Tr. 399-405.

If a treating physician's medical opinion is supported by medically acceptable diagnostic techniques and is not inconsistent with other substantial evidence in the record, the treating physician's opinion is given controlling weight. *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001); 20 C.F.R. § 404.1527(d)(2). An ALJ may reject the uncontradicted medical opinion of a treating physician only for "clear and convincing" reasons supported by substantial evidence in the record. *Holohan*, 246 F.3d at 1202 (citing *Reddick*, 157 F.3d at 725). If the treating physician's medical opinion is inconsistent with other substantial evidence in the record, treating source medical opinions are still entitled to deference and must be weighted using all the factors provided in 20 C.F.R. § 404.1527. *Id. (*citing SSR 96-2p). An ALJ may rely on the medical opinion of a non-

12 - OPINION AND ORDER

treating doctor instead of the contrary opinion of a treating doctor only if she provides "specific and legitimate" reasons supported by substantial evidence in the record. *Id.*

The ALJ found that the form completed by Dr. Nelson was leading and designed to elicit opinions supportive of disability. In order to provide an answer less favorable to the claimant's receipt of disability benefits, the physician must provide a written explanation. Tr. 29. The ALJ noted that Dr. Nelson checked answers indicating severe disability, including that Plaintiff is incapable of even "low stress" jobs, is unable to walk for more than a block on a "bad" day, and is unable to sit for two hours on a "bad" day. The ALJ concluded that Dr. Nelson's "opinions about the nature/diagnoses/prognosis/severity of the claimant's impairments are given little weight because this physician appears to have relied on the claimant's reporting rather than objective medical evidence." Tr. 29.

Dr. Nelson's affirmation of the limitations described by plaintiff is contradicted by other examining physicians, including Dr. Verhey and Dr. Higgins-Lee. Tr. 232-36, 237-41. Both Drs. Verhey and Higgins-Lee questioned Plaintiff's credibility with respect to his limitations. Dr. Higgins-Lee found that Plaintiff was only moderately depressed. Tr. 240.

Further, the limitations endorsed by Dr. Nelson are not supported by the objective medical evidence.

In September 2002, Nelson referred Plaintiff to an orthopedist for his left knee pain. Tr. 381. In December 2002, plaintiff saw a chiropractor and reported a "mild" increase in lower back pain, and a "slight" increase in neck pain. Tr. 198. However, plaintiff continued to work as a roofer through December 2002.

On July 30, 2003, plaintiff reported to his chiropractor that his lower back was "much better,"

but his neck worse.  Tr. 193.  On August 11, 2003, plaintiff reported that his lower back pain was "greatly improved," though there was no change in the pain in his upper back or neck.  Tr. 192.

On November 15, 2003, Dr. Nelson saw plaintiff to renew his medication contract for MS Contin "to control his chronic knee pain in lieu of surgery."  Tr. 247.  Dr. Nelson prescribed Klonopin to take at night "to help with the back spasms and leg spasms that he has had, really secondary to his knee pain which changes his gait.  Most of his spasms are in the low back.  He denies any other complaints."  *Id.*

On November 28, 2003, Dr. Nelson saw plaintiff for groin pain.  Tr. 246.  Plaintiff did not cooperate with physical examination, but Dr. Nelson diagnosed probable hernia and referred him to a surgeon.

On January 16, 2004, Dr. Nelson noted that plaintiff had been unable to obtain the surgeries required to repair his hernia and knee, and that he had a positive depression screen.  Tr. 244.  He prescribed amitriptyline and lexapro for depression.  Dr. Nelson did not record any complaint of back or neck pain.

On February 19, 2004, Dr. Nelson noted that plaintiff had complained of "thoracic back pain for a number of months to years," that a recent MRI of the thoracic spine was normal, and assessed "[T]horacic back pain, unknown etiology at this time."  Tr. 349.

On April 26, 2004, an MRI of the cervical spine indicated degenerative disc disease at C5-C6 "with posterior osteophytes projecting in the expected location of the cervical spinal canal at that level.  Mild bilateral encroachment is present at the cervical neuroformaina at the levels of  C5-C6 and C6-C7.  Small diffuse posterior osteophytes are present at the level of C6-C7."  Tr. 253.

Dr. Nelson's chart notes do not support his later affirmations of severe limitations.  Tr. 399-

14  - OPINION AND ORDER

405.  For example, Dr. Nelson affirmed as correct plaintiff's assertion that since June 2003 he suffered severe episodes of depression two to three times a month, during which he would be completely incapacitated for at least one and sometimes two days.  Tr. 401.  Actually, Dr. Nelson's chart notes do not mention depression until January 2004.  Tr. 244.

In sum, the ALJ had clear, convincing, specific and legitimate reasons to discount Dr. Nelson's conclusions.  His decision is supported by substantial evidence.

IV.  Opinion of the Examining Psychiatrist

Plaintiff argues that Dr. Amato assessed a current GAF score of 50 in her July 2004 examination, and that the ALJ erred by failing specifically to reject it or incorporate it into his findings.  A GAF of 41 to 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR a serious impairment in social, occupational, or school functioning (e.g., no friends, conflicts with peers or co-workers)."  American Psychiatric Ass'n., *Diagnostic & Statistical Manual of Mental Disorders* 34 (4th Tr. ed. 2000) ("DSM -IV").  Dr. Amato also opined that plaintiff's highest GAF score in the past year had been 60.  Tr. 286.  A GAF score of 51 to 60 indicates "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers )."

_____The ALJ noted Dr. Amato's report in some detail, though he did not specifically cite the GAF scores.  Tr. 28-29.  The ALJ did review the entire record and incorporated in his RFC assesment all of the mental limitations based on substantial evidence.  The RFC assessment limited plaintiff to simple, repetitive tasks and instructions and also limited exposure to hazards such as dangerous moving machinery and heights.  Tr. 34.  This assessment is consistent with the GAF scores assessed

by Dr. Amato and consistent with the rest of the medical record.

The ALJ also noted that Dr. Amato stated in response to a questionnaire prepared by plaintiff's counsel that she did not know if the severity of plaintiff's depression would cause him to miss work more than one day per month, or would preclude completion of a normal eight hour work day.  Tr. 29, 391.  In addition, Dr. Amato did not identify any functional limitations arising from plaintiff's mental limitations.  Accordingly, the ALJ did not err by failing specifically to address the GAF scores assessed by Dr. Amato.

## **CONCLUSION**

The findings of the Commissioner are based upon substantial evidence in the record and the correct legal standards, and therefore the court affirms the decision of the Commissioner.

IT IS SO ORDERED.

Dated this  31  day of January, 2007.


/s/ Ann Aiken
ANN AIKEN
United States District Judge

16  - OPINION AND ORDER